UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID MICHAEL SNYDER,

        Plaintiff,

v.                          Case No. 8:21-cv-1963-VMC-UAM

MCS OF TAMPA, INC.,
and GILBERT T. GONZALEZ,

        Defendants.

_____/

**ORDER**

This matter is before the Court on consideration of Defendants MCS of Tampa, Inc., and Gilbert T. Gonzalez's Motion for Summary Judgment (Doc. # 130), filed on August 1, 2024. Plaintiff David M. Snyder responded on August 22, 2024. (Doc. # 137). Defendants replied on September 5, 2024. (Doc. # 152). For the reasons that follow, the Motion is granted.

**I.**   **Background**

    **A.**   **The Contracting Parties**

MCS is a Florida corporation with several hundred employees. <u>See</u> (Def. Ex. 1 at ¶ 5). AeroSage LLC is a Florida limited liability company (<u>Id.</u> at ¶ 6).

Snyder, as a service-disabled veteran of the U.S. Air Force, has "participated in hundreds, probably thousands, of U.S Government acquisition certifications, verification

1

inspections, bids, awards, contracts, subcontracts, and protests." (Pl. Ex. 2 at ¶ 4). He "was the unconditional service-disabled veteran 100% owner and operator for AeroSage LLC during the relevant times." (Id. at ¶ 9). "Snyder was a W-2 and beneficial owner employee of AeroSage, one of his Subchapter S disregarded entities operating as President and contractor." (Id. at ¶ 20).

According to James Slagle, the Chief Administrative Officer of MCS, Snyder was never an employee, contractor, or agent of MCS or Gonzalez. (Id. at ¶ 7). Also, Snyder is not a named party to any contract with either MCS or Gonzalez. (Def. Ex. 1C; Def. Ex. 1D; Def. Ex. 1E). Rather, as discussed further below, MCS only entered into contracts with AeroSage, the entity for which Snyder was President.

Snyder admits he was never a "W-2 employee" of MCS. (Def. Ex. 2 at 7, 79). But he denies that he was never a contractor for MCS and that he was never an agent for MCS. (Id. at 7, 79-80). And, in his declaration, Snyder avers he "was an employee, contractor, or agent of Defendants." (Pl. Ex. 2 at ¶ 21). In support of that statement, Snyder cites Defendants' original responses to his requests for admissions. (Id.). In those responses, Defendants wrote "Objection, the request is

untimely" in response to all of Snyder's requests. (Pl. Ex. 3 at 8-9, 13; Pl. Ex. 3A at 5-8).

Because of a calculation error, Defendants were incorrect that Snyder's requests for admissions were untimely. (Doc. # 128). After it became apparent that they were incorrect on the issue of timeliness, Defendants served amended responses to Snyder's requests for admission. (Id.). Although Snyder had moved to compel better responses the day before Defendants served their amended responses, Snyder subsequently withdrew his motion to compel after receiving Defendants' amended responses. (Doc. # 132).

**B.    The Mentor – Protégé Relationship**

MCS and AeroSage each, and separately, have historically engaged in contracting with the U.S. Government. (Def. Ex. 1 at ¶ 8).

Gonzalez and Snyder met in 2015 at a doctoral program in which they were both enrolled, and by 2016, they had come to know each other and each other's businesses. (Id. at ¶ 9).

During this time period, (i) MCS had experience with a mentoring/protégé program supervised by the Small Business Administration ("SBA") that enabled established businesses like MCS to assist newer businesses like AeroSage become established; (ii) MCS and AeroSage were both aware of the

3

U.S. Government's preferential treatment (set-aside contracting) offered to certain categories of small businesses; and (iii) AeroSage had become certified in one such category – Service Disabled Veteran Owned Small Business ("SDVOSB") (Id. at ¶ 10).

In October 2016, MCS helped AeroSage apply to the SBA for approval of the joint participation of MCS and AeroSage in the SBA's Mentor/Protégé Program ("the MPA Application"). (Id. at ¶ 11). The MPA application included a proposed Mentor/Protégé Agreement between MCS and AeroSage dated October 21, 2016 ("the MPA Agreement"). (Id. at ¶ 12). The SBA approved the MPA Application on November 8, 2016. (Id. at ¶ 13).

The approval of the MPA Application, and the execution of the MPA Agreement, were followed by the execution by MCS and AeroSage of a Master Subcontract Agreement dated December 2, 2016 ("the MSA"). (Id. at ¶ 14). Under the MSA, MCS was a subcontractor to AeroSage.

The MSA contemplated that MCS and AeroSage would work together on a variety of projects where the skills and qualifications of MCS and AeroSage could be complementary and beneficial. Specifically, the MSA contemplated that MCS would provide labor, material, supplies, and/or services to

4

AeroSage to support AeroSage's performance under various contracts between AeroSage and the Prime Contractors thereunder. (Id. at ¶ 15).

The MPA Agreement and the MSA defined the business relationship between MCS and AeroSage, and AeroSage won four contracts to perform services for the U.S. Veterans' Administration ("the VA"). (Id. at ¶ 16). Eventually the relationship between MCS and AeroSage soured and ended. This led to two state court cases that proceeded to arbitration regarding alleged breaches of the contracts. The Court will address each contract separately.

C.   **The HMS/Unify Project**

One such project was known as "HMS/Region 4 Unify PBX Support" ("the HMS/Unify Project"). (Def. Ex. 1 at ¶ 17). In connection with the HMS/Unify Project, on August 24, 2017, MCS and AeroSage entered into a Teaming Agreement ("the HMS/Unify Teaming Agreement"). (Id. at ¶ 18). On September 1, 2017, MCS and AeroSage entered into a Sub-Subcontract Agreement ("the HMS/Unify Subcontract Agreement"). (Id. at ¶ 19).

In the arbitration proceeding discussed more fully below, AeroSage claimed, among other things, that MCS failed to properly perform its obligations, including MCS's

5

obligations under the MSA, as it related to the HMS Unify Project. MCS performed its obligations under the HMS/Unify Project agreements and the arbitrator ruled AeroSage failed to pay MCS $344,434.20 under the HMS/Unify agreements. (Id. at ¶ 20). Although the arbitrator found that "MCS did not provide an acceptable [limits on subcontracting ('LOS')] contribution" for this contract, the arbitrator did "not find this to be a breach of the HMS/Unify contract." (Def. Ex. 1A at 28).

   **D.   The HMS/VISN2 Project**

Another project was known as the HMS/VISN2/Canadaigua Contract ("the HMS/VISN2 Project"). (Def. Ex. 1 at ¶ 21). On December 2, 2016, MCS subcontracted with AeroSage to provide services in connection with the HMS/VISN2 Project. (Id. at ¶ 22).

In the arbitration proceeding, AeroSage claimed that MCS failed to properly perform its obligations under the subcontract, including MCS's obligations under the MSA, as it related to the HMS/VISN2 Project. In contrast, MCS maintains that it performed its obligations under both HMS/VISN2 Project agreements. (Id. at ¶ 23).

The arbitrator found AeroSage failed to pay $44,000.00 due to MCS under the HMS/VISN 2 Project agreements. (Id. at ¶ 23).

**E.   The B3 Bay Pines Project**

A third project was known as the B3 Bay Pines PBX Maintenance and Support Project ("the B3 Bay Pines Project"). (Id. at ¶ 24). In connection with the B3 Bay Pines Project, MCS subcontracted with AeroSage to perform services required thereunder. (Id. at ¶ 25). The relationship between AeroSage and MCS was primarily governed by the MSA. (Id.).

In the arbitration proceeding, AeroSage claimed that MCS failed to properly perform the obligations required of it, including MCS's obligations under the MSA, as it related to the B3 Bay Pines Project. The arbitrator found MCS did not breach either B3 Bay Pines Project-related agreement. (Id. at ¶ 26).

The arbitrator found that AeroSage failed to pay MCS $53,405.22 for work done between June 24, 2018, and September 24, 2018, for the B3 Bay Pines Project. (Id.).

**F.   The VA/ATS - Bay Pines Contract**

The fourth project was known as the VA ATS Replacement at Bay Pines Contract ("the VA/ATS Project"). (Id. at ¶ 27). In connection with the VA/ATS Project, the VA issued a work

7

order or purchase order to AeroSage in January 2018. (Id.).
The work was divided between AeroSage and MCS. (Id.).

In the arbitration proceeding, AeroSage claimed that MCS
failed to properly perform the obligations required of it,
including MCS's obligations under the MSA, as it related to
the VA/ATS Project. Again, the arbitrator found MCS performed
its obligations under the VA/ATS Project agreements and found
AeroSage failed to pay MCS $51,085.85 for MCS's services under
the VA/ATS Project agreements. (Id. at ¶ 29). The Arbitrator
found that MCS did not breach the MSA. (Id. at ¶ 30).

### G.   **The State Court Litigation and VA Complaints**

In August 2018, MCS sued AeroSage and Snyder in the
Circuit Court for Hillsborough County for breach of the
business and contractual relationship between MCS and
AeroSage and conversion in Case No. 18-CA-008316. (Def. Ex.
1, ¶¶ 31-32; Pl. Ex. 2C). The amended complaint in that state
court action asserts claims for breach of operative
subcontract and breach of fiduciary duty against AeroSage,
aiding and abetting breach of fiduciary duty against Snyder,
and conversion against both AeroSage and Snyder. (Def. Ex.
1F). The gravamen of MCS's allegations in this state court
case was that AeroSage failed to pay MCS for services rendered
under the various contracts between MCS and AeroSage and that

8

Snyder had personally converted money owed to MCS under the contracts. (Def. Ex. 1 at ¶ 33; Def. Ex. 1F; Def. Ex. 1G).

Then, starting on September 10, 2018, AeroSage — through Snyder — sent a series of complaints to the VA ("the VA Complaints"), alleging a series of alleged misdeeds by MCS and its representatives in connection with the various contracts between AeroSage and MCS. (Def. Ex. 1 at ¶ 34). Some of these allegations include that MCS violated the LOS for subcontractors, rendering the contractors' claims for the payment to the government to be false. (Def. Ex. 1H).

In December 2018, MCS brought an additional action in Case No. 18-CA-012642 in the Circuit Court for Hillsborough County, asserting claims for defamation, trade libel, tortious interference, and racketeering against AeroSage and Snyder. (Def. Ex. 1G). The gravamen of this state court case was that Snyder and AeroSage had defamed MCS through Snyder's complaints to the VA about MCS's practices. (Id.).

**H.   <u>Arbitration</u>**

As mentioned previously, AeroSage demanded the state court litigation be referred to arbitration before the American Arbitration Association and the action was referred to arbitration. (Def. Ex. 1 at ¶ 35).

In the arbitration, MCS prosecuted its claims against AeroSage and Snyder, and AeroSage asserted a counterclaim, alleging that MCS had breached its obligations under the various contracts and violated certain federal regulations, seeking monetary damages against MCS and Gonzalez (for alleged conversion). (Id. at ¶ 36). Snyder did not assert an individual claim.

In January 2020, a three-day evidentiary arbitration hearing was held, where the parties were represented by counsel, and when numerous witnesses testified live and through deposition transcripts and numerous exhibits were admitted into evidence. (Id. at ¶ 37).

## I.   **The Award & Final Judgment**

After the hearing, the arbitrator issued a written Award on February 26, 2020, and the Award was confirmed by the state court on December 4, 2020. The judgment was entered on behalf of MCS and Gonzalez. The Award addressed each and every claim and counterclaim. (Def. Ex. 1A). It awarded damages to MCS and denied all relief sought by AeroSage.

The Award rejected AeroSage's arguments about MCS's allegedly violating the limits on subcontracting ("LOS") requirements as a breach of their contracts. See (Id. at 22) ("Although the B3 Bay Pines contract does impose obligations

on MCS to assist B3 in being compliant with LOS, I cannot find that those obligations were breached."); (Id. at 24) (finding that "the evidence is insufficient to demonstrate that LOS was actually violated" for the HMS/VISN contract); (Id. at 28) (finding, as to HMS/Unify contract, that "MCS did not provide an acceptable LOS contribution" but this was not "a breach of the HMS/Unify contract"); (Id. at 30) ("Here, the Aerosage and MCS obligations to assist the prime contractors with LOS compliance were contract-based, not direct to the government, so it is not possible to make out an illegality argument from these facts. In addition, I have found that there have been no LOS sanctions sought by the VA, and MCS did not take over control of Aerosage.").

The judgment assessed damages of $364,749.60 against AeroSage and Snyder, jointly and severally; and additional damages of $165,762.26 against AeroSage. (Id. at ¶ 38; Def. Ex. 1A). An Amended Final Judgment was entered on December 4, 2020. (Def. Ex. 1 at ¶ 39; Def. Ex. 1I).

**J.   Procedural History**

On August 16, 2021, nine months after the entry of the Amended Final Judgment, Snyder, in his individual capacity, and as relator for the benefit of the United States, filed this action. (Doc. # 1). The original complaint alleged three

separate counts under 31 U.S.C. § 3729 and a retaliation claim under 31 U.S.C. § 3730.

On January 13, 2023, the U.S. Government declined to intervene in the action. (Doc. # 20). On April 13, 2023, this Court dismissed the Section 3729 claims without prejudice and allowed Snyder to proceed with his individual retaliation claim. (Doc. # 30).

On September 5, 2023, approximately two and a half years after he first filed the Complaint, Snyder filed his Amended Complaint against MCS and Gonzalez alleging retaliation under 31 U.S.C. § 3730. (Doc. # 35). The Amended Complaint is brought "on behalf of [Snyder] himself." (Id. at 1, 6).

AeroSage is currently in bankruptcy. See In re AeroSage LLC, Case No. 8:21-bk-3694-CPM (Bankr. M.D. Fla. July 15, 2021). During this litigation, Snyder contacted the bankruptcy trustee to ask for permission to pursue FCA retaliation claims on AeroSage's behalf. (Pl. Ex. 2F). In response, the bankruptcy trustee declined to pursue the FCA retaliation claims on behalf of AeroSage, writing: "Mr. Snyder, I will not be pursuing the below causes of action. Accordingly, if you believe warranted, you may pursue them on your own behalf." (Id. at 3).

12

Now, Defendants move for summary judgment on the FCA retaliation claim. (Doc. # 130). Snyder has responded (Doc. # 137), and Defendants have replied. (Doc. # 152). The Motion is ripe for review.

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

13

trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting <u>Celotex Corp.</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only

proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

Additionally, Rule 12(h)(3) states: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Thus, the Court may consider motions to dismiss for lack of subject matter jurisdiction at any time." <u>Roberts v. Swearingen</u>, 358 F. Supp. 3d 1341, 1346 (M.D. Fla. 2019). Motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may attack jurisdiction facially or factually. <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 924 n.5 (11th Cir. 2003). In factual attacks, the Court delves into the arguments asserted by the parties and the credibility of the evidence presented. <u>Garcia v. Copenhaver, Bell, & Assocs.</u>, 104 F.3d 1256, 1260-61 (11th Cir. 1997).

## III. **<u>Analysis</u>**

Defendants argue for summary judgment on the basis of both standing and res judicata. The Court will address each argument in turn.

**A.**   **Standing**

Defendants challenge Snyder's standing to bring this case on his own behalf. (Doc. # 130 at 13-16). The Court agrees that Snyder lacks statutory standing.

"A plaintiff's standing to bring and maintain her lawsuit is a fundamental component of a federal court's subject matter jurisdiction." Baez v. LTD Fin. Servs., L.P., No. 6:15-cv-1043-PGB-DCI, 2016 WL 3189133, at *2 (M.D. Fla. June 8, 2016) (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)). The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016).

To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). The injury must be "particularized," meaning it

16

"must affect the plaintiff in a personal and individual way."
Id. (quoting Lujan, 504 U.S. at 560 n.1). Additionally, the
injury must be "concrete," meaning "it must actually exist."
Id. "To establish standing, a 'plaintiff generally must
assert his own legal rights and interests, and cannot rest
his claim to relief on the legal rights or interests of third
parties.'" Guillaume v. Hyde, No. 20-60276-CIV, 2020 WL
3317042, at *3 (S.D. Fla. June 18, 2020) (quoting Warth v.
Seldin, 422 U.S. 490, 499 (1975)), aff'd sub nom. Guillaume
v. U.S. Dep't of Veterans Affs., 847 F. App'x 627 (11th Cir.
2021).

There is also statutory standing. "Statutory standing is
simply statutory interpretation: the question it asks is
whether Congress has accorded *this* injured plaintiff the
right to sue the defendant to redress his injury." Graden v.
Conexant Sys. Inc., 496 F.3d 291, 295 (3d Cir. 2007). "To
answer the question, [courts] employ the usual tools of
statutory interpretation." Id.

Here, Snyder lacks statutory standing. In so holding,
the Court has conducted a review of the amended complaint and
the evidence submitted to the Court on summary judgment. This
record evidence includes the contracts between MCS and
AeroSage LLC. See (Def. Ex. 1B; Def. Ex. 1C; Def. Ex. 1D;

17

Def. Ex. 1E). Considering these contracts, it is clear that Snyder was not a contractor of any Defendant. Rather, AeroSage, of which Snyder was sole member, owner, and President, had contracts with MCS. This contractual relationship between AeroSage and MCS led Snyder to work closely with MCS and Gonzalez. But Snyder never worked for MCS or Gonzalez.

Indeed, Snyder admitted in response to Defendants' requests for admissions that he was never a "W-2 employee" of MCS. (Def. Ex. 2 at 7, 79). Nor is there any record evidence that Snyder served as an agent for MCS or Gonzalez. See Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006) (explaining that agency is "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); United States ex rel. Worthy v. E. Maine Healthcare Sys., No. 2:14-CV-00184-JAW, 2017 WL 211609, at *33 (D. Me. Jan. 18, 2017) (dismissing FCA retaliation claim where the "factual allegations in the Third Amended Complaint [were] not sufficient to generate a reasonable inference that a

principal-agent relationship existed between CHMB and [plaintiff] Ms. Worthy").

At most, in his declaration, Snyder conclusorily states that he "was an employee, contractor, or agent of Defendants." (Pl. Ex. 2 at ¶ 21). Although an "employee," "contractor," and "agent" are three distinct roles, Snyder's declaration does not allege which he supposedly was. In making his conclusory legal assertion that he served in one of those three roles, Snyder cites in his declaration to Defendants' response to certain of Snyder's requests for admissions. (Id.). But Defendants did not admit to Snyder's request for admission that Snyder was an employee, contractor, or agent of Defendants. (Pl. Ex. 3A). Rather, Defendants — albeit incorrectly — wrote in their original, timely responses to admissions "Objection, the request is untimely." (Id. at 5-8). Thus, the requests for admission Snyder relies on in his declaration as evidence that he was "an employee, contractor, or agent" of Defendants did not, in fact, admit that Snyder was any of those things. After Defendants became aware their timeliness calculation was incorrect, Defendants served amended responses to Snyder's requests for admissions. (Doc. # 128). After Defendants served the amended requests for admission, Snyder withdrew his motion to compel better

responses. (Doc. # 132). Notably, Snyder does not rely on the amended responses to his requests for admissions.

And Snyder's bare legal conclusion in his declaration that he was either an employee, or a contractor, or an agent of Defendants does not create a genuine issue of material fact on this issue. "It is well-settled that conclusory affidavits, submitted by a nonmoving party in opposition to a motion for summary judgment, will not create an issue of fact for trial. Conclusory allegations without specific supporting facts have no probative value." Org. of Pro. Aviculturists, Inc. v. Kershner, 564 F. Supp. 3d 1238, 1247 (S.D. Fla. 2021); see United States v. Stein, 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory."); In re Walker, 531 B.R. 194, 202 (Bankr. E.D. Tenn. 2015) ("For an affidavit to create a genuine dispute as to any material fact, it must do more than 'reiterate [the] allegations in vague and conclusory terms.' A non-moving party cannot withstand a motion for summary judgment by providing a 'bare legal conclusion' or without providing 'specific information that might conceivably create a genuine issue.'" (quoting Emmons v. McLaughlin, 874 F.2d 351, 355 (6th Cir. 1989)). As mentioned before, beyond that bare legal conclusion, there is

no evidence to support that Snyder individually was an employee, contractor, or agent of Defendants.

Thus, Snyder did not have an employment-like relationship with any Defendant.[1] Rather, he was a member of an LLC that had a contract with MCS. Snyder has brought this case on his own behalf and may not now pursue any FCA retaliation claim that AeroSage may have had. See (Doc. # 35 at 1) (stating that the amended complaint is brought "on behalf [of Snyder] himself"). The statement by the bankruptcy trustee that Snyder "may pursue [the FCA retaliation claim] on [his] own behalf" (Pl. Ex. 2F) does not amend the amended complaint or otherwise render Snyder able to bring a claim on AeroSage's behalf in this case. Furthermore, even if the

_____

[1] For this reason, even assuming that Snyder had Article III or statutory standing to bring this claim, Snyder's FCA retaliation claim would still fail. Even after the 2009 amendments to the FCA, "Congress still intended to limit the FCA to employment-like relationships." Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1062 (6th Cir. 2014); see also 31 U.S.C. § 3730(h)(1) ("Any employee, contractor, or agent shall be entitled to all relief . . . ."). Because Snyder was not an employee, contractor, or agent of Defendants, he cannot succeed on an FCA retaliation claim against Defendants. See U.S. ex rel. Abou-Hussein v. Sci. Applications Int'l Corp., No. CIV.A. 2:09-1858-RMG, 2012 WL 6892716, at *2 (D.S.C. May 3, 2012) ("[Section] 3730(h) provides a cause of action only for an employee or a person in an employment type of relationship, such as an independent contractor or agent. As previously noted, Plaintiff had no employment, contractual or agency relationship with Defendants."), aff'd, 475 F. App'x 851 (4th Cir. 2012).

trustee's email had any effect, Snyder still could not pursue a FCA retaliation claim for AeroSage pro se. "[A]s the Court has previously informed Snyder, he could not proceed pro se while asserting claims on behalf of an LLC." Snyder v. Formerly B 3 Grp., Inc., No. 8:21-cv-2150-VMC-AEP, 2024 WL 2724435, at *6 (M.D. Fla. May 28, 2024); In re Rodriguez, 633 F. App'x 524, 526 (11th Cir. 2015) ("A corporation cannot appear *pro se* in litigation and must be represented by counsel because it is an artificial entity only able to act through its agents. This rule applies even where the individual seeking to represent the corporation is an officer or major stockholder. Parties may not evade this general rule by assigning the corporate claims to a *pro se* plaintiff individually." (citations omitted)).

Because Snyder was not an employee, contractor, or agent of Defendants, Snyder lacks statutory standing under the FCA. See Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1064 (6th Cir. 2014) ("Because the plain meaning of 'employee' does not include applicants and the FCA's legislative history and case law from other courts reinforce that 'employee' is limited to employment-like relationships, we agree with the district court that Vander Boegh lacks statutory standing under the FCA. Accordingly, EnergySolutions is also entitled

to summary judgment in its favor on this claim."). For this reason, Defendants are entitled to summary judgment.[2]

**B.   Res Judicata**

Alternatively, even if Snyder had standing to pursue a retaliation claim against Defendants, his claim is barred by res judicata. (Doc. # 130 at 16).

"Under Eleventh Circuit precedent, a claim will be barred by prior litigation if all four of the following elements are present: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999).

There is no real dispute that the first three elements are met. There is a final judgment entered by the Florida state court, which is a court of competent jurisdiction. (Def. Ex. 1I). The judgment is in favor of MCS and Gonzalez and

---

[2] Because summary judgment must be granted for this reason, the Court need not address whether Snyder had Article III standing to bring his retaliation claim as a member of AeroSage. That is, the Court need not determine whether the retaliatory harm Snyder claims he suffered was a "direct harm" "such that the alleged injury does not flow subsequently from an initial harm to" AeroSage. Chavez v. Coro, No. 19-23577-CIV, 2019 WL 4929929, at *2 (S.D. Fla. Oct. 7, 2019).

against Snyder, as well as AeroSage. (Id.). The same parties — Snyder, MCS, and Gonzalez — were involved in the arbitration proceeding and bound by the judgment. (Id.).

That leaves the fourth element. "When determining whether the causes of action are the same for purposes of res judicata, we consider 'whether the primary right and duty are the same in each case.'" Batchelor-Robjohns v. United States, 788 F.3d 1280, 1285 (11th Cir. 2015) (citation omitted). "Although [the Eleventh Circuit has] described the 'rights and duties' test as the 'principal' res judicata test, [the Eleventh Circuit has] stressed that courts must also consider the factual context of each case along with the 'rights and duties' at issue." Id. (citation omitted).

"In general, even if the rights and duties at issue are distinct, where a case 'arises out of the same nucleus of operative fact, or is based upon the same factual predicate,' as a former action, the two cases constitute the same 'claim' or 'cause of action' for purposes of res judicata." Id. at 1286. "When applying the 'same nucleus of operative fact' test, [courts] 'look to the factual issues to be resolved [in the second lawsuit between the parties] and compare them with the issues explored in [the first lawsuit].'" Id. at 1286 (citation omitted). Courts "apply a pragmatic approach to

this analysis by comparing the substance of the actions, not their form." Id.

In the arbitration proceeding, the claims brought by MCS were breach of contract and unjust enrichment against AeroSage and conversion against Snyder. (Def. Ex. 1A at 2). AeroSage counterclaimed with breach of contract and breach of fiduciary duty claims against MCS and a conversion claim against Gonzalez. (Id.). All of these claims relate to the relationship between MCS, Gonzalez, AeroSage, and Snyder, and the disagreements that led to the end of their working relationship. During the arbitration, Snyder and AeroSage raised their allegations that MCS violated the limits on subcontracting ("LOS") that applied to their government contracts. (Id. at 20-31). The arbitrator ruled against AeroSage and Snyder concerning MCS and Gonzalez's supposed breaches of contract caused by LOS violations. See (Id. at 22) ("Although the B3 Bay Pines contract does impose obligations on MCS to assist B3 in being compliant with LOS, I cannot find that those obligations were breached."); (Id. at 24) (finding that "the evidence is insufficient to demonstrate that LOS was actually violated" for the HMS/VISN contract); (Id. at 28) (finding, as to HMS/Unify contract, that "MCS did not provide an acceptable LOS contribution"

25

but this was not "a breach of the HMS/Unify contract"); (Id. at 30) ("Here, the Aerosage and MCS obligations to assist the prime contractors with LOS compliance were contract-based, not direct to the government, so it is not possible to make out an illegality argument from these facts. In addition, I have found that there have been no LOS sanctions sought by the VA, and MCS did not take over control of Aerosage.").

In this action, Snyder is bringing, in his personal capacity, an FCA retaliation claim. But the underlying facts still largely overlap with the facts of the state court cases and arbitration. The alleged violations of the LOS are central to the false claims violations that Snyder initially alleged in this action. That is, because MCS allegedly violated the LOS, Snyder maintains that the claims for payment submitted to the government were false. See, e.g., (Doc. # 1 at 33) ("On these documented subcontracts, as well as a larger unlisted subcontract, it is believed that MCS misrepresented the service work performance requirements under the LOS by passing through to their affiliated national OEMs. MCS made false representations to EPS and ultimately to the government that MCS performed the work and that MCS was a small business concern making claim on these Federal contract dollars."); (Doc. # 35 at 14) ("Plaintiff repeatedly asked Defendants to

provide the required mentoring assistance to AeroSage [to] establish technical workforce and payroll, and accounting in order to comply with the LOS on these VA service contracts in order to not be in violation of FCA.").

Furthermore, Snyder's removal of MCS's access to AeroSage's bank account, his complaints to MCS, and his complaint to the VA about MCS's alleged LOS violations were what Snyder alleges led to retaliation against him and AeroSage. See (Doc. # 35 at 18) ("[U]pon concluding the Defendants were not going to comply with, and not provide, personnel mentoring support to comply with the LOS, Plaintiff took protected action required by law and regulations to exercise control over AeroSage SunTrust bank account, ensuring electronic access, signed updated signature card, signing, to my surprise, a new statement of beneficial ownership, arranging ACH authority, and removing Defendants' signature authority."); (Id. at 20) ("In furtherance of the FCA, on or about August 21, 2018, Plaintiff explained to Mr. Gonzalez and Mr. Jim Slagle, the MCS Chief Operating Officer, the requirements needed to comply with the LOS before the completion of the base year of the HMS and B3 subcontracts consistent with the FAR, VAAR, SBA regulations and law."); (Id. at 31) ("On or about August 16, 2018, Defendants

27

discharged, demoted, suspended Plaintiff when terminating MCS-AeroSage Subcontract Agreement T4NG-16-0025 supporting HMS's prime VA SDVOSB Task Order Prime Contract number VA11817F10140007, VISN 02 PBX Maintenance. This termination was directly because of Plaintiff's earlier complaints that this subcontract would not be able to comply with the LOS by the end of the contract period year.").

These same activities by Snyder — keeping Defendants out of their bank account and filing VA complaints against them — underly the claims and counterclaims raised in the state court cases and arbitration. See, e.g., (Def. Ex. 1A at 33-34) ("Unable to convince MCS, General Snyder took matters into his own hands. According to MCS, he threatened to report the alleged LOS violations to the VA if MCS did not accede, and he threatened to take control of the SunTrust account and pay himself what he thought Aerosage was owed out of future HMS payments under his interpretation of the LOS. On August 20, 2018, he removed Brian Calka as an authorized signator on the SunTrust Account."); (Id. at 35) ("On September 10, 2018, Aerosage escalated the dispute by sending a letter to the VA Inspector General, with a copy to a VA Contracting Officer. [] Aerosage accused MCS of fraud, claiming it never intended to honor LOS obligations in its subcontracting process, and

that it misrepresented the M/PA and other agreements to him/Aerosage in order to obtain the HMS/Unify subcontract. No fraud claims are specifically asserted in this arbitration, although Aerosage argues that the B3 and HMS contracts are illegal and unenforceable because they violate LOS requirements. However, my reaction to this letter is consistent with how I am deciding this dispute. The record here only supports a good faith effort by MCS to comply with LOS and with government contracting principals in general, including the Ethics in Government Contracting that General Snyder alleges MCS has violated."); (Def. Ex. 1F at 7-8) ("On August 20, 2018, MCS was informed by SunTrust that Mr. Snyder requested removal of Mr. Calka as a signatory on the Trust Account, which would of course deprive MCS of dominion of the cash collateral pipeline."); (Def. Ex. 1G at 5) ("In telephone conversations in July and August 2018, Defendant Snyder threatened Gilbert Gonzalez, Plaintiff's CEO, that, unless MCS agreed to increase Defendant AeroSage's compensation under the Subcontract Agreement, Defendant Snyder would make accusations to the VA that MCS was engaging in procurement fraud and other unlawful and fraudulent conduct, and otherwise seek to prejudice Plaintiff MCS in its relationship with the VA. Gonzalez rejected Defendant Snyder's demands and

threats. On September 10, 2018, Defendant Snyder made good on his threats, when he sent the letter attached hereto as Exhibit D [] to the VA Inspector General Hotline.").

In short, Snyder's complaints about supposed LOS violations and the conduct of MCS and Gonzalez at the end of the parties' working relationship are still at the heart of this case. For this reason, the Court agrees with Defendants that both the state court proceedings and the arbitration have the same common nucleus of operative fact as this action. The fourth element of res judicata is met.

True, the FCA retaliation claim is a different legal cause of action than those asserted in state court and the arbitration. But res judicata "pertains not only to claims that were raised in the prior action, but also to claims that could have been raised previously." Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1187 (11th Cir. 2003) (citation omitted); see also Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999) ("Res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding."). Snyder could have counterclaimed with his FCA retaliation claim in the state court case and arbitration. Indeed, "state courts have concurrent jurisdiction over claims brought under the federal False Claims Act." United

States ex rel. Charte v. Am. Tutor, Inc., 934 F.3d 346, 354 (3d Cir. 2019); see also Paul v. Parsons, Brinkerhoff, Quade, & Douglas, 53 F.3d 1282 (5th Cir. 1995) ("Paul's assertion that he could not have asserted his FCA claims in the state court action is erroneous; state courts have concurrent jurisdiction over FCA claims."); Driscoll v. Superior Ct., 223 Cal. App. 4th 630, 644 (Cal. Ct. App. 2014) ("[W]e conclude that state courts have concurrent jurisdiction over FCA retaliation claims."). Furthermore, an FCA retaliation claim can be resolved through arbitration. See Orcutt v. Kettering Radiologists, Inc., 199 F. Supp. 2d 746, 756 (S.D. Ohio 2002) (finding that an FCA retaliation claim "is subject to arbitration"); Mikes v. Strauss, 889 F. Supp. 746, 756 (S.D.N.Y. 1995) (holding that plaintiff's FCA retaliation claim "must be resolved through arbitration," even though plaintiff's qui tam FCA claims were not arbitrable).

Despite the FCA retaliation claim being a different cause of action, res judicata applies because this case arises from the same nucleus of operative fact as the state court cases and arbitration.

Accordingly, it is hereby

**ORDERED**, **ADJUDGED**, and **DECREED**:

31

(1)  Defendants MCS of Tampa, Inc., and Gilbert T. Gonzalez's Motion for Summary Judgment (Doc. # 130) is **GRANTED**.

(2)  The Clerk is directed to enter judgment in favor of Defendants MCS of Tampa, Inc., and Gilbert T. Gonzalez and against Plaintiff David M. Snyder.

(3)  Thereafter, the Clerk is directed to terminate all deadlines and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 18th day of September, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE